May it please the court, my name is Joe Zasatarsky, I'm a lawyer in Raleigh, North Carolina, and I represent Charles Robert Barefoot, Jr., who is the defendant and the appellant in this case. Mr. Barefoot is 51 years old, he's serving a 180-month sentence resulting from the trial in this case. He was convicted of six counts. This case has a long and tortured procedural history, which plays into the first issue that I'd like to discuss with the court. He was indicted in 2005, he wasn't served with that indictment until 2006. There was a superseding indictment later in 2006, and then in February of 2007, the district court judge referred him for an evaluation based on some conduct that occurred at a hearing in the case. He was found not competent due to delusional disorder and remained that way until March of 2011. We came back for a hearing on whether or not he should be involuntarily medicated, and Butner rendered an opinion that Mr. Barefoot had become confident that his condition had remitted. Our expert agreed with that, and the case proceeded from there. In March of 2012, he filed a pro se motion to represent himself, and a hearing was held on that later in March of 2012. But isn't a trial judge in a much better position than we are to evaluate somebody's competency to represent themselves at trial? Well, Your Honor, it's an abuse of discretion standard, certainly. It is an abuse of discretion standard, but But I mean, there's a reason for the abuse of discretion standard, and that is that the actually observe the defendant, and we're not. And that kind of makes all the difference. Well, Your Honor, I asked the court to consider two issues on that. The first is, at the hearing itself, Mr. Barefoot's conduct at that hearing in March of 2012 was entirely different than his conduct at the hearing in 2007, five years earlier. Five years. He answered all of the judge's questions, he explained why he wanted to represent himself, and the district court found that his Being competent to stand trial doesn't make you really competent to represent yourself in a federal criminal trial. Your Honor And those things, there's a disconnect that jumps right off the page, like that last case of common sense, it seems to me, and I think Judge Boyle said pretty much that. Well, Your Honor, this court's holding in Bernard is that the key question is whether the defendant is otherwise able to, who is otherwise able to satisfy the competency standard may nevertheless be unable to carry out the basic tasks needed to present his own defense without the help of counsel. This Indiana v. Edwards case really hurts your position, because the Supreme Court explicitly refuses to equate competency to stand trial with competency to undertake pro se representation. They do, Your Honor, but they also point out that, number one, the right to represent yourself is a basic constitutional right. It may not be the wisest thing to do, but it is a defendant's right. Well, not only is it not the wisest thing to do, but if he'd represented himself and the trial had gone south and the examination, cross-examination of witnesses was a disaster and evidence wasn't properly objected to and the closing argument was a mishmash, we'd be up here on a claim of error that the district court had abused its discretion in not allowing this to go forward on a counsel basis, and I don't like these situations where we get whipsawed either way, because I can see an argument saying, oh, the district judge should never have let this go forward on a pro se basis. Look what happened. It was a disaster. And then we'd be up here on that claim of error. So you know, you just put the trial judge in a situation where he can't win. Well, Your Honor, that was what happened in Edwards, actually. That was the claim in Edwards. The defendant represented himself, and the claim on appeal was that he shouldn't have been allowed to represent himself. This is the flip of the situation. And again, so here- But they stand for the same principle, which is the competency to stand trial and competency to undertake pro se representation. Criminal trial is not a place for amateurs. And you really got to know what you're doing. And just having standby counsel oftentimes just doesn't really cut it. And the Supreme Court saying, it seemed to me Indiana v. Edwards was trimming back a little bit on the Faretto right and saying, you know, it's not absolute. It's subject to a district court trial management discretion. But, Your Honor, in Edwards, the defendant was allowed to exercise his right. And the point I'd stress to the court- But the legal point, legal principles are the same. Correct. Correct. But the point I would make to the court is here, to deprive the defendant of that right, the standard has to be met. The evidence before the district court has to give the district court a basis under the standard. And what I'd ask the court to consider here is, what evidence was before the district court that when Charles Barefoot was standing in front of the district court in March of 2012, that he could not carry out the basic tasks necessary to represent himself without the assistance of counsel? The court had a year-old opinion from the doctor at Button that found him competent to represent himself with representation by counsel. That's what the report said. The prosecutor was very candid with the district court judge and said, I haven't talked to Dr. Newman since then. And I don't know if what he meant was he can't represent himself. I think an experienced trial judge is much better positioned to opine on something like that than a doctor, whether somebody's competent to represent themselves in a federal criminal trial. I mean, it's not a sporting event. No, Your Honor. No, Your Honor. But again, we're depriving the defendant of his right. And what evidence is there in the record to support that finding?  And it's under the Bishop discretion standard of review. Correct. Correct. I thought you had better issues than that. I'm surprised you spend that much time on it. Well, Your Honor, I didn't intend to, and I apologize. I want to move any questions. You start to open these things up, you open up questions, too. I'm sorry, Your Honor. I'd like to move, if I could, to the issue of count three in the denial of the Rule 29 dismissal motion, the solicitation to commit crime of violence charge. The evidence in that case came from one witness, Marvin Glenn Gauthier. And with respect to that issue, you will recall that Mr. Gauthier said that Mr. Barefoot, the charge was that Mr. Barefoot had this plan to blow up the Johnston County Courthouse. According to Mr. Gauthier, Mr. Barefoot's plan was that Mr. Barefoot was going to jump in a raft, float down the Neuse River, which goes sort of right next to Smithfield, which is where the Johnston County Courthouse is. He was going to jump out of his raft, carry his bomb, run three blocks into the middle of Smithfield, which through the sheriff we established that's how far it was with a map, somehow plant the bomb and set it off without blowing himself up, run back to the raft and float away. And the government's theory was that Mr. Barefoot solicited Mr. Gauthier to assist him in doing this by asking for a ride. The problem we would submit with the government's position is twofold. Number one is there's no evidence of solicitation. If you go to the actual trial transcript, there is literally four lines that cover this. Gauthier testified, didn't he? Correct. Wasn't he in a pretty good position to know whether he thought he was being solicited or not? And he said he wasn't sure, Your Honor. I thought he said that Barefoot was serious. He said he thought he was serious, but what he said, Your Honor, that was key was, question, now was he asking you to do anything like this? Answer, I think that was in his mind, but he didn't come out and just ask me to do it. He said that's what he had in mind and wanted to find somebody to do it. That's just a jury question, isn't it? I mean, it's just something you'd bring up in your clothes and you'd go over that testimony and the like, but I mean, it's just a question of sort of how the jury assess the interaction between Gauthier and Barefoot in terms of whether he was trying to bring him along to blow up this courthouse. Well, Your Honor, I think there's two things I'd ask you to consider with respect to that. Number one is that there has to be some level of solicitation. Solicitation means to ask somebody to do something. That's the common sense. That's what it is. And here, even the government... He doesn't use the word solicit. No, sir. But he does have to ask. I think he has to ask. I think the question is whether the jury... We have to... You're running up against another tough standard of review. Correct. We look at the evidence in the light most favorable to the prosecution at this stage on that kind of... And, Your Honor, I would just argue that solicit means just that and that there's no evidence of him asking Gauthier to do anything. I mean, these two people had a relationship that didn't just include this one contemplated act. It included the Pettus murder and some other things. And so, you know, they kind of understood where each of them was coming from, you know? And a lot of times when you have two Confederates and associates, you know, the jury could decide, well, you know, a wink and a nod. That told me all I needed to know. Well, Your Honor, I think that the Pettus murder, for example, is a perfect example. There, Mr. Gauthier said, barefoot, told me to go. Told me to go. That's solicit. That's the direction. Right, but there's a history of solicitation of Mr. Gauthier here and the jury was entitled to put this conversation in context. You know, it did not occur in a vacuum. It occurred between two people who had known each other a good bit of time, had collaborated in various ventures in connection with their clan membership, and the jury had all that in front of it. And the main thing the jury had in front of it was Gauthier's interpretation of the conversation, not just in the verbal expression of it, but in the body language and the credibility. Well, Your Honor, I would just say that in the earlier, in September of 2011, 2001, according to Pettit, according to Gauthier, with respect to Pettit, he says, barefoot, told me, directed me. And that's what would have happened here if there was a solicitation. That would be my argument. I'm running short on time. But then I want to just ask you, didn't the defendant speak in detail with Gauthier about his courthouse plan? Your Honor, the only, the detail is on Joint Appendix page 601, the one paragraph of Mr. Gauthier's testimony. He says he mentioned something about he planned on doing at the courthouse. He mentioned floating down the river and then goes into the plan that I described. That's the detail. So I would suggest to the court there's not much detail. Well, floating down that river and running down three blocks and getting back and all that stuff. He told him he had explosives, too, didn't he? Well, he said that his plan, as part of the plan. I thought he told him he had acquired liquid explosives. I don't think he had told him that at that point, Your Honor, no. Not during this conversation. And the other thing is, maybe this is the kind of, maybe the jury said, hmm, this is not the kind of act that can be done completely on a solo basis and that some assistance here would be very much in the defendant's interest. And who did he turn to for assistance? Somebody who'd helped him in the past and whom he felt he could trust. And, I mean, the jury could, the jury could connect all those dots. Well, it's a question of where the line is, Your Honor. It's a question of where the line is. If I'm generally talking about something, and again, the usual solicitation is, I ask you to go do X. I'm soliciting you to go commit a crime. Here, Mr. Barefoot, according to this testimony, is saying, I'm going to commit a crime. But I need a ride. Will you get me first and drop me off later? Under the government's theory. I think the question is whether we're going to reduce all these crimes to a magic word or that there's got to be some, you know, some kind of magic formulation before you can, the question is whether the totality of the circumstances amounts to solicitation, not whether you actually use the word, I solicit, or I ask, or I request. Well, Your Honor, I would just submit that there has to be some affirmative action by the defendant. And that's the line that I suggest to the court. There's one other point that I do want to try to mention quickly, and that's with respect to the denial of the pretrial motion to dismiss counts 4, 5, and 6. That's the plea agreement thing? That's the plea agreement thing. Were you his counsel? I was. In the plea agreement? Yes, sir. Why did you agree with the provision to reserve the right for the government to use his admissions about violent crimes? Because I understood crimes of violence did not include the possession or talking about possessing explosives. Why would you reserve it anyway? I mean, that's it. He's going to come clean? Why wouldn't he just come clean and they give him use immunity? And they said, well, we won't give him immunity. We'll give him immunity about everything except crimes of violence. So if he admits to a crime of violence, he can be prosecuted. Because, Your Honor, they also... That just encourages the defendant to go in there and lie. I can't imagine two lawyers writing that in a plea agreement. Your Honor, because they also wanted to talk to him about a murder. Well, that's a crime of violence. Correct. He was going to deny everything. And he did deny any involvement in the murder. But you get people to tell the truth by encouraging them to tell the truth. Not hold back because they're afraid of what a crime of violence is. Because y'all didn't even define it. Didn't even attempt to define what a crime of violence is. Do you adopt something in a federal statute? We have cases every week up here. We're here arguing about what a crime of violence is. Just encouraging litigation. Well, Your Honor, I never anticipated that this would encourage litigation because I know what I talked about with the prosecutor. And that prosecutor... Out of all these... The definition of crime of violence is... In the last few years in the federal court system is in dozens and dozens of cases. Because we're trying to figure out what it is. And you all put it in a plea agreement. That's where you try to get rid of a case. Get it over with. And you all put it in there and now you're up here. Counts four, five, and six. Can't be prosecuted, I think, if they're crimes of violence. Right? If they're not crimes of violence. Correct. They can be prosecuted if they're crimes of violence based on what he said. And he was prosecuted for them. And you're saying, well, they're not crimes of violence so she shouldn't have been prosecuted. Correct. Well, then we've got to decide, I guess, whether four, five, and six amount to a crime of violence under some definition that you all didn't give each other. Whether they're barred or not by the plea agreement. Just if I could respond very quickly, Your Honor. I think the issue you've honed in exactly, but I would say defining crime of violence was how was that defined between the parties. And what the government bargained for here was the government bargained for You're going outside the plea agreement by telling us what they bargained for. You've got to write this stuff down. Except you should be arguing, I assume, we've got to construe it against the government because they wrote it. That's just normal law. Which is what we have in our brief. Correct. I see my time is up. Thank you. Thank you, Your Honor. Good morning. May it please the court. Seth Wood on behalf of the United States. The defendant raises five issues. We believe all five should fail. We're asking this court to affirm the judgment of the district court. I'll start with the last issue that the defendant raised. The plea agreement. Do you acknowledge that you used against him as to counts four, five, and six information received from him during his debriefing pursuant to the plea agreement? No. The defendant moved to suppress statements about liquid explosives from that debrief. We did not use... You prosecuted him on evidence entirely independent of anything you got from him in his debriefing as to counts four, five, and six. Is that what you're saying? No, no, no, Your Honor. Let me be clear. That's a yes or no? No. Did the government independently develop evidence unrelated to anything he said to prosecute counts four, five, and six? I honestly don't know the answer to that. But that's a crucial answer as to whether those convictions can stand up in view of the plea agreement. Well, depending on whether they're crimes of violence or not. And a couple of them aren't. Five and six I don't think are. Number four may be. And if it is, maybe you can prosecute him because of that exception. But if five and six aren't, you couldn't use against him what he said for any purpose. Your Honor, I respectfully in terms of the immunity that we've provided to the defendant in that plea agreement, it's use immunity. It's not derivative use. And I've been using the term use. You could not use that in the prosecution of those counts unless those counts are crimes of violence. If you take the position all three of them are crimes of violence, you've got the exception to argue about. Is that what you say? That all three of them are crimes of violence? Let's see. The counts themselves, five and six. You don't brief that. Correct. But that's the key as to whether you could use the information. Counts four, five, and six, which ones are crimes of violence and which ones aren't? Right. Or is the answer to all are or all aren't? No, four is definitely a crime of violence. Four is. Definitely. But in five and six, I don't want to wave the answer, Your Honor. I'm going to argue that they would be given the inherently dangerous nature of the explosive. Five is what? Storing explosives. Right. So everybody that stores explosives is engaging in a crime of violence. I understand the implication. Or improper storage. Your Honor, if I could just turn back to the languages. What definition of crime of violence are you going to use since you didn't put it in the plea agreement? We would use the one in the guidelines? One in, I don't know what you're using. Right. It would have been the common definition of crime of violence at the time they entered into the plea agreement in 03. Can we get back to the question Judge King asked earlier and that is to what extent was the evidence used, evidence obtained during the debriefing used in the course of the prosecution on count four, five, and six? Right. Mainly five and six. Right. The, I can say that the statements and I want to clarify one point. There's an admission about the murder. There are three statements excuse me, two statements from the debrief that were initially discussed. There was a statement about the liquid explosive about trading. We already had that liquid explosive in our possession by the time this debrief occurred. Then there was his acknowledgement. If you didn't make a record on that? Before where? In the district court. If you're going to use that evidence there's what they call a taint hearing and you got to prove that the evidence you're using is not tainted by the fact that you got it from him if it was given pursuant to an immunity agreement. And you didn't have such a proceeding. Well, no, Your Honor. Again, I may just be mixing terms. I'm drawing a distinction between use immunity and derivative use immunity and that's it matters obviously here. As I was saying there were two statements made. One was the liquid explosive statement. The other one was a statement about the murder. The liquid explosive statement was not used at trial. The liquid explosive information came in through Mr. Gautier and Maynard as well as Barefoot the son also talked about the hiding of the liquid explosive. The Well, the fact it came in from somebody else doesn't mean you didn't use it against him. If you found the witness as a result of what he said you've used it against him. It's got to be untainted. I'll acknowledge there was no I mean, it's diseased. If you used what you got from him after you promised him in the plea agreement, you wouldn't. I thought there was a search warrant issue before you debriefed him. If so where did you get that information to seize the explosive? The explosives came from Mr. Barefoot's wife and she provided information to law enforcement. That's an agent Babbitt's testimony early on in the trial. That formed a search warrant for us. That included a mention of liquid explosive. I think she specifically said it had been moved from Mr. Barefoot's house to his son's house. That's how the government had these simultaneous warrants. I'm sorry. That's how the government got simultaneous warrants. We searched both the defendant's house and his son's house and we found liquid explosive at the son's house. The statement about the murder... Barefoot told you all in the debriefing that he traded hunting dogs for liquid explosives at least three times, right? I'm not sure about the number, but definitely they traded for hunting dogs. You all brought that up multiple times during the trial including in the opening statement. Yes. And we did that because we had... What exception of the plea agreement permitted you to use that? Your Honor, I apologize if I'm misunderstanding. I'm interpreting used to mean, he says X. If we were to take that statement in trial and try to use it against him in trial, then that would be a problem. We'd have to get through an exception. You and I misunderstand what the law, what use means. There's derivative use. We don't have that. And then there would be transactional, which would be very broad. And as we've been arguing, we've been trying to argue that effectively he's asking for a form of... You're arguing that derivative use was permitted under the terms of the plea agreement? No. Well, sorry, permitted, yes. Would you get your act together? I don't know what you're saying to us. Let me say, come on and make your argument. Yes, Your Honor. What are you saying? We're saying that the plea agreement provision, paragraph 4F, was a use immunity provision, period. I found in preparation for oral argument there is certainly a distinction between use and derivative use immunity. In which do you say you were using the evidence only derivatively? At most it would be derivative. I'm not conceding. You used none of the actual statements? We used the murder statement for count three. That's okay. And that came in through Agent Babbitt's testimony. As to the liquid explosive, we had testimony from Mr. Gautier who helped arrange the transaction. And Mr. Gautier came in... Sorry. We had his testimony. We had testimony from Mr. Gautier who was also present for the exchange in terms of the liquid explosive exchange. So we have independent evidence of this liquid explosive changing hands. Was that independent evidence obtained without relationship to anything you said? Right. I mean, I always understood use immunity didn't cover derivative use. You had to prove an independent source of the evidence. A wholly independent source that if you were going to use something you had to prove that you got it entirely independent of any information that came from the defendant's mouth if you got it pursuant to a use immunity promise in a plea agreement. So you and I misunderstand whatever the law is but we may have to figure that out. I apologize. No, you don't apologize. You thought you think you can use derivatively, you can use it. If he tells you that he and the other guy planned to do something and you talk to the other guy as a result of that and he confirms it, you can put the other guy on the witness stand. Yes. That's my understanding. You took his evidence and found the other witness as a direct result of it and you can use it. Theoretically, yes. But again, I'm not conceding that we even had derivative situation here. We did have the liquid explosive in hand prior to Mr. Gauthier's debrief. Excuse me, Mr. Barefoot's debrief. Are you making a harmless error argument or are you not conceding error and if you're not conceding error, is it because you had an independent source for every one of the facts that was introduced at trial? What are you saying? What are you saying? I'm trying to say that we had people not Mr. Barefoot and people who were not relating Mr. Barefoot's statements at trial discussing the liquid explosive. That's what I'm saying. I'm sorry. That would be more of a harmless error analysis, wouldn't it? That would be more of a harmless error question. If you had plenty of independent evidence, it wouldn't be a question of derivative use and saying, well, we can use questions derivatively. What you'd be saying is, look, we had a lot of independent evidence that related to the storing of explosives and the distribution of explosive material and that evidence came in abundance on pages on counts 5 and 6. Are you saying that? I'm not conceding error. You're not conceding error? You're not arguing harmless error? No, no, no. You got the same sentence on every charge too, didn't you? I mean, if you lose counts 5 and 6, you still got the same sentence. Sure. Absolutely. No, I mean the harmless error would certainly be an alternative basis. But you don't want to argue a harmless error. You abandon harmless error? No. Does the government abandon an argument of harmless error? Goodness gracious, no. I apologize. No. I'm trying to say that Your Honor, I interpreted that as am I just arguing harmless error? Are you arguing harmless error or are you not? I am. Sure. Yes. You are. Okay. I thought you just said to me a few minutes ago you weren't. Well, I'm trying to argue both. The harmless would be an alternative ground. I'm trying to make the point that the unambiguous language of this plea agreement it's our belief that we with that language because we didn't use any of his statements. Why is this harmless on counts 5 and 6? Why is it harmless error? Counts 5 and 6. It would be harmless because again we have Mr. Maynard and Mr. Gutierre testifying about Mr. Maynard specifically seeing the explosive in Mr. Fairfax's fridge freezer Mr. Gutierre understood that that's where the explosive went as well. So that's count 5 that's improper storage. Count 6 would be the transfer to Mr. Barefoot's son Daniel Barefoot testified that he received the explosive from his father the package which turned out to be the explosive from his father and so that's his recipient and he put it Does the harmless error doctrine apply to derivative uses to derivative uses in violation of a plea agreement? I honestly don't know. I'm sorry. Does harmless error doctrine apply if there's a breach of a plea agreement in terms of using in terms of derivative use? If there's in violation of a plea agreement there's a derivative use at trial of the statements in the debriefing Does a harmless error analysis apply to save that or is that something that we just don't expect the government to do no matter what? We didn't brief the issue so I would We did not brief that specific question and I don't know the specific answer. Let me ask you this The statutory immunity that the government can provide to a citizen to secure their testimony if they do it statutorily someone invokes the Fifth Amendment and the Attorney General and the U.S. Attorney agree that they want them to testify they can give them statutory immunity and that compels them to testify that gets past the Fifth Amendment privilege and it provides that anything they say can't be used against them Would you agree with me that since you didn't define what you mean by use in the plea agreement that probably the best place to look to see what use means would be to look at the statute I think it's 6205 or something Title 18 to see what the use immunity statutory immunity is that's been authorized by Congress That's the only immunity really that the statute covers Use immunity If you get transactional immunity you've got to get something the prosecutor has to stretch it but he can only give use immunity under the statute that is a court can only order that That would be Do you rely on that use definition in that statute? We are not expressly relying on it I was trying to pull It's not defined in your plea agreement Right You say it's a use immunity provision We're taking it to me There's a specific exception there for you that you put in and you must have been a tough negotiator You got an exception for violent crimes If he admits to a violent crime we can prosecute him for it We can use that against him But otherwise it's a use immunity provision for non-violent criminal activity Right I'm just trying to get you to agree that we could use whatever the statute means by use immunity If the court believes that it's ambiguous then certainly that would be something to look to The case that I was talking about there was a decision the Smith decision from 2006 to distinguish between use and derivative use It's not a brief I found it in preparation for this argument It's at 452 F3 323 and that's I was looking for trying to find examples of this difference We talk about use, we talk about derivative we talk about transactional and use is the narrowest form of the three I The defendant also raised other issues which we'll rely on in our brief If I could briefly mention sentencing We think the district court was correct to group all the offenses for sentencing purposes because there was a continuous and ongoing offense behavior here so that's 3D 1.2D We discussed that on page 63 of our brief We actually discussed both subsection C and D in our brief and I just want to leave with D because the offense behavior here through all six offenses we view as continuous and ongoing We did cite one case I just want to clarify the Mullins case on page 62 That was discussed in terms of relevant conduct that applies if that offenses are grouped because of ongoing or continuous offense behavior We believe they are ongoing and continuous for the reasons laid out in our brief I can address any other issue of the court would like or three others What is the logical connection between the theft of the firearms from his uncle and the explosive materials that would allow the district judge to group it all together In our view the defendant is all of these things share one common thread and so the defendant is using his leadership position, his clan organization and the people under it to bring dangerous items to him for his own use So he's bringing in the stolen guns through Daniel Barefoot Maynard and Avery Gautier is helping him All these people are in his clan organization Around the same time he's acquiring this liquid explosive Mr. Gautier is helping him acquire that He's acquiring or he's talking to Mr. Gautier around the same time, maybe a month past that about his plan and trying to recruit him into his plan The liquid explosive, of course, once it's brought in Mr. Barefoot keeps it on his property when he believes that he's being surveilled in June of 2002 by Mr. Avery One of his clan members He tries to move a series of items and that includes the liquid explosive The police ultimately find both the liquid explosive and one of the stolen firearms That's one of the counts from the conspiracy in Daniel Barefoot's house So there's an overlap there If there are no further questions we ask the court to affirm the judgment of the district court Thank you Mr. Zasitarsky you have some rebuttal time, sir Thank you, Your Honor First, Your Honor with respect to the government's position about the plea agreement and to address your question, Judge King about how do we define the crime of violence let me be crystal clear about our position about this The government made a promise to Mr. Barefoot and that promise was not just we're not going to use your statement The promise was you are going to get, the term was a walk or a free pass for what you told us about bombs Now you're going outside the plea agreement Correct That's another deal You all negotiated this plea agreement and you put it in writing and you're stuck with the writing Well, Your Honor I submit that under the cases from this court we're not stuck with the writing because the government Why was the crime Well, you are stuck with the writing and we might interpret it against the government It's an integrated plea agreement It's explicit There are no promises outside this particular agreement Your Honor, for example the plea agreement in Harvey which we cite in our brief says that the Eastern District of Virginia agrees to not prosecute the defendant further for the conduct constituting the basis of the indictment Everybody at that time also knew that the defendant was potentially subject to prosecution in the District of South Carolina I'm saying, you know when you have a plea agreement and it's an integrated plea agreement and anybody can bring up some kind of oral promise anytime, anywhere and what it does is it undermines the integrity of plea agreements to try to do that Why don't you focus in what is the provision in the plea agreement in the plea agreement itself that you hang your hat on with respect to counts 5 and 6 The definition of crime of violence Alright, what definition? There is no definition. It's defined between the parties and the definition between the parties is the promise that the government made to the defendant Are we supposed to take a guidelines definition or an arms career criminal act definition or whatever? No, Your Honor I think you take the definition that the government told the defendant that he was going to get a walk for what he told us about bombs and explosives. That's the oral promise, isn't it? Well, but that necessarily No, I'm talking about the provisions in the plea agreement Quit coming back to the oral promise The alleged oral promise. What provision in the plea agreement? Read it out to me Well, Your Honor, I hang my hat on the exception for the crime of violence Alright, read it Well, there's no definition for crime of violence in the plea agreement Do you agree that count 4 is a crime of violence? I do not agree that count 4 So you don't agree in any of them You say 4, 5, and 6 are all non-violent I would say that count 4 is akin to a felon in possession of firearm which is not a crime of violence Here it's simply possession. It's illegal receipt. What you do here is it's just like a statutory term that's undefined And if you don't have a term in the statute that's undefined elsewhere in the statute And here we have an undefined term. It's not defined elsewhere in the plea agreement Then you take a common sense look at it And the Supreme Court's clear about that. Undefined terms You take a common sense view of it Receipt of an explosive with intent that it be used to murder or injure persons or property It doesn't seem to me a whole lot of I don't have to make a leap to determine that if you're taking an explosive with an intent that it be used to murder or injure someone that doesn't trouble me finding that that's a crime of violence Now your 6 is a closer case 5 is an even closer case But I want to know what your derivative use was made of statements in violation of the plea agreement and if so what statements were used what particular statements were used what particular provision of the plea agreement did they violate and why was it not harmless error Your Honor I know you told me not to go back to the oral promise I don't know I don't want to hear about the oral I want to hear about a provision of the plea agreement that was violated because that was negotiated between the parties And Your Honor I would say that that is a provision of the plea agreement between the parties. Well it's not. Assume you're wrong on that. That the plea agreement is what's on the paper except that If I'm wrong on that Your Honor I think that you have to use a common sense definition of the term crime of violence Not a statutory definition Correct because this is an undefined term And assuming you are right on a couple of accounts like 5 and 6 where he got concurrent sentences why isn't that harmless error Well I think practically speaking it would be because he got concurrent sentences I would concede that Your Honor That's what I'm getting at he got a concurrent sentence If we vacate the convictions and sentences on accounts 5 and 6 if we were hypothetically that wouldn't help him a bit when he ever got out of penitentiary Correct in terms of the practical effect of it You also raised account 3 for lack of evidence he still wouldn't help him any right Well Your Honor I think that would affect the guideline calculation even under the government's view. Alright accounts 5 and 6 wouldn't affect the guidelines. I don't think they would Your Honor I don't think they would And very quickly to jump to the guidelines question which came up during the government's presentation It's important to note that what the district court hung the connection to allow all of this grouping on was testimony about a pipe bomb that somebody testified about seeing Mr. Barefoot set off in his yard and possessing his home and again I would simply go back to the terms of relevant conduct which are that the gun counts of 1 and 2 and the other counts of 3, 4, 5 and 6 can only be grouped if 3, 4, 5 and 6 were done during the commission of the offense in preparation for that offense or in the course of attempting to avoid detection or responsibility for that offense that offense being the stolen gun charges and the possession of the pipe bomb simply had nothing to do with commission of the stolen gun offenses something occurring in the course of the stolen gun offenses or some effort to avoid detection or responsibility for those offenses so I would say to the court that the basis that the district court relied on to group those together by the very terms of relevant conduct I don't know why you say that they're all unconnected what he did is he was grouping the gun counts and the explosives counts and they were all connected to the KKK activities weren't they violent plan in the defendant's position as head of the KKK chapter whether he was going to be doing it with guns or whether he was going to do it in explosives the point is he was using violent means to achieve the KKK's goals in which he was a very prominent member both the probation office and the district court adopted the these pipe bombs as being the basis to link this all together an argument would be that it's not relevant conduct so they can't link it all together I see my time is up thank you alright we'll come down and greet counsel and we will first adjourn court this honorable court stands adjourned signing die God save the United States and this honorable court
judges: J. Harvie Wilkinson III, Robert B. King, Henry F. Floyd